NOTICE

Decision filed 03/17/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250888-U

NOS. 5-25-0888, 5-25-0889, cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* REESE M. and REMI M., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 24-JA-22, 24-JA-23 |
| | ) | |
| Ray M., | ) | Honorable |
| | ) | Robert E. Jacobson, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CLARKE delivered the judgment of the court.
Presiding Justice Cates and Justice McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We grant appellate counsel's motion to withdraw and affirm the trial court's order terminating the respondent's parental rights to his children where the evidence supported the trial court's findings and there is no meritorious argument to the contrary that appellate counsel can raise on behalf of the respondent.

¶ 2    In this consolidated appeal, the respondent, Ray M. (Father), appeals an order of the circuit court of Champaign County terminating his parental rights to his minor children. Attorney John B. Hensley, who was appointed to represent Father on appeal, has filed a motion to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967). Hensley argues that there are no arguably meritorious claims to be raised on behalf of Father because (1) the trial court's findings of unfitness were supported by the evidence and (2) the trial court's determination that termination

1

of his parental rights was in the children's best interest was likewise supported by the evidence. We grant Hensley's motion to withdraw and affirm the order of the trial court terminating parental rights.

¶ 3                                    I. BACKGROUND

¶ 4    This case began on February 28, 2025, when the State filed petitions for adjudication of neglect, abuse, or dependency for Father's minor children, Reese M. and Remi M., twin boys born in August 2020 in the following cases: case Nos. 24-JA-22 and 24-JA-23. The first case involved Reese M., and the second case involved Remi M. Because the pleadings that followed are, for the most part identical, we will refer to the pleadings in case No. 24-JA-22 unless otherwise noted, and we will discuss the cases collectively wherever possible. The petitions alleged that the children were neglected by virtue of being in an environment injurious to their welfare because they were exposed to substance abuse while living with their mother, Kayle B. (Mother). See 705 ILCS 405/2-3(1)(b) (West 2022).[1]

¶ 5    Along with the petitions, the State filed a shelter care report indicating that on January 22, 2025, the Department of Children and Family Services (DCFS) received a report that the home where Mother resided with the children looked like a "crack house" due to the number of people entering and leaving. The home was reported to be filthy, with bathrooms that were "not suitable for use," rotting food present in the home, and a dog locked in a bedroom where he defecated and urinated. In addition, the 3-year-old twins reportedly were left in the care of their 15-year-old brother, Kayden L., for days at a time and that Mother was using drugs while the children were present in the home. Reportedly, there was a hole in her nose resulting from her past use of cocaine.

---

[1]Mother separately appealed the trial court's ruling and is not a party to this appeal. Another case was opened involving her older son, Kayden L. (born October 2008); however, that case is not before us in this appeal. We will discuss matters related to Mother and Kayden only to the extent they are pertinent to resolution of the issues before us.

A subsequent visit to the home by child protection investigators confirmed this description of the children's living environment. Over the next several weeks, attempts were made to engage Mother in intact services. However, on February 27, 2024, the children were taken into protective custody.

¶ 6 The trial court held a shelter care hearing on the same date, February 28, 2025. Father did not appear at the hearing, and the court ordered DCFS to provide notice to Father or file an affidavit as to its diligent efforts to do so. Mother stipulated to the allegations of neglect and to the urgent and immediate need for temporary custody. The court entered a temporary custody order that day placing custody and guardianship of the twins with DCFS.

¶ 7 On March 6, 2024, the State filed an amended petition for adjudication of neglect, abuse, or dependency. The petition corrected Father's address to reflect his current address in Elyria, Ohio.

¶ 8 On April 30, 2024, the court held an adjudicatory hearing. Father waived adjudication, and Mother stipulated to the allegations in the petition. The court entered an adjudicatory order finding that the twins were neglected and that Mother imposed the neglect.

¶ 9 On May 28, 2024, the court held a dispositional hearing. The same day, it entered a dispositional order making the twins wards of the court.

¶ 10 On August 19, 2024, after a hearing, the court entered the first permanency order in this case. It set a goal of return home within 12 months and found that Father made reasonable efforts toward that goal, but he did not make reasonable and substantial progress.

¶ 11 The next permanency hearing took place on December 16, 2024. The court entered a permanency order that day, maintaining a goal of return home within 12 months. Neither the order nor the docket sheet included findings concerning reasonable efforts or reasonable and substantial progress.

¶ 12    The court entered another permanency order after a hearing on April 14, 2025. This time, the court found that neither parent made reasonable efforts or reasonable and substantial progress. However, the court maintained a goal of return home within 12 months.

¶ 13    On May 19, 2025, the State filed a motion for a finding of unfitness and to terminate parental rights. It alleged that both parents were unfit on the following three grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the children (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period following adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) failure to make reasonable progress toward the return of the children during any nine-month period following adjudication of neglect (*id.* § 1(D)(m)(ii)). The petition identified the nine-month period between August 19, 2024, and May 19, 2025, for purposes of both failure to make reasonable efforts and failure to make reasonable progress.

¶ 14    The State's motion came for a hearing on August 26, 2025. At the outset, the trial court noted that Father appeared only through his attorney. Father subsequently joined the hearing in progress by Zoom while the first witness was testifying.

¶ 15    The State's first witness was Austin Schmohe, a foster care family caseworker for the Center for Youth and Family Services (CYFS). Schmohe served as the children's caseworker from April 2024 until February 2025. He noted that he began transitioning the case to the new caseworker before he left. Schmohe testified that the children came into care due to allegations of substance abuse and allegations that their home was dirty, they lacked food, and they were left alone in the care of their older brother.

¶ 16    Schmohe testified that during the pendency of this case, Father lived in Elyria, Ohio. His service plan required him to take a parenting class, engage in individual psychotherapy, submit to

4

drug tests, complete a substance abuse assessment, and follow up with any substance abuse treatment recommended as a result of the assessment. Schmohe acknowledged that Father's residence in another state made it difficult to accomplish what needed to be done. He testified, for example, that CYFS "struggled to find a parenting class in his area that would—that would work with our, our agency."

¶ 17    Schmohe testified that Father completed a substance abuse assessment and submitted to two drug tests at a facility in Ohio called BrightView. Both tests were negative for any illicit substances but were positive for alcohol. The assessment did not recommend any treatment. Although the facility informed Schmohe of these results, he was never provided with a copy of the assessment. Father signed a release form to allow BrightView to provide information to Schmohe. Father also told Schmohe that he attempted to get the facility to provide him with a copy of the assessment; however, it never happened.

¶ 18    Schmohe was unable to schedule any additional drug tests for Father for two reasons. First, because CYFS did not have a contract with any facility in Ohio, it could not arrange for drug tests to be random. Second, Father would have to pay for the tests himself, either through insurance or cash, and this was not an option for him.

¶ 19    Father never provided Schmohe with verification of employment. Schmohe noted that while he was the caseworker, Father was trying to apply for some type of benefits "like Social Security." However, he did not know whether Father had completed this process.

¶ 20    Schmohe was unable to conduct a home visit. He testified that he never attempted to arrange a visit. Partly, this was because of the distance. However, Schmohe also explained that setting up a home visit was not a priority while he was the family's caseworker because Father was not considered a viable placement option for the children until he completed services.

5

¶ 21 Next, the State asked about visitation. Schmohe explained that a traditional visitation schedule was impossible due to the distance. However, Father traveled to Illinois for three or four in-person visits with the children while Schmohe was their caseworker. They also scheduled "virtual" visits via Zoom, but these were often difficult to arrange. Schmohe explained that at times it was difficult to get a hold of Father. Other times, Father had technological problems getting Zoom to work with his phone. In addition, because the twins were very young, it was hard for them to stay engaged with an image on a screen. Father had two virtual visits with the children during Schmohe's tenure as caseworker. Father never gave Schmohe gifts, cards, or letters to pass along to the children.

¶ 22 Regarding the requirement of individual psychotherapy, Schmohe testified that Father indicated he was attempting to get insurance and would then look for a therapist who accepted his insurance. Shortly before Schmohe left the case in February 2025 Father informed him that he had found a counselor willing to take his insurance.

¶ 23 Schmohe testified that both parents were difficult to contact at times. It was common for him not to hear from Father for a week or two at a time. Father generally explained his lapses in communication by saying he was busy or out-of-town or that his phone was not working. In addition, Father did not contact Schmohe at all between approximately the end of 2024 or beginning of 2025 and the beginning of February 2025.

¶ 24 Father indicated to Schmohe that he was considering returning to Illinois "so that he could participate in the case," but he would not commit to doing so. Shortly before Schmohe left the case, Father informed him that he intended to remain in Ohio. When he left the case, Schmohe was not close to ready to return custody of the children to Father.

¶ 25    On cross-examination, Father's counsel inquired about visitation. Schmohe stated that he observed the visits that took place, and they went well. Father was attentive during visits and played with the twins. They appeared to share a bond. Schmohe testified, however, that Father only stayed for the entire two-hour visit on one occasion. He left the other two visits an hour early. One visit ended early because Father had to return to Ohio for a prior engagement. The other ended early because the children were getting hungry, and Father did not bring enough food for them. He ended the visit early so they could go home and eat.

¶ 26    Finally, Schmohe testified that Father told him he was trying to find services in Ohio. Although Schmohe could not confirm this, he believed Father. He explained that he, too, tried to find services for Father and did not meet with success.

¶ 27    Sanya Thompson, who became the family's caseworker at the end of January 2025 also testified for the State. Thompson testified that, at that time, Father's only requirements were housing and individual therapy. Thompson was initially unable to contact Father. Her first conversation with him took place in March 2025. At that time, Father indicated that he had been attempting to contact her but that he did not have the correct number.

¶ 28    Regarding visitation, Thompson testified that between the time she established contact with Father in March 2025 and May 19, 2025, when the motion to terminate was filed, Father engaged in one in-person visit with the children and one visit via Zoom. She testified that she informed Father that she saw the children every Tuesday between 3 and 5 p.m. and offered him the opportunity to visit with them via Zoom for 30 minutes every other week. She explained that each time, she sent him a text to set up the visit. During the relevant time period, Father took advantage of this opportunity for a Zoom visit only once.

¶ 29    Thompson next testified concerning the requirement of individual therapy. She was aware that Father began therapy at BrightView, but then moved to a facility called Psych and Psych. She noted that Father attempted to get these facilities to release information to her, but his attempts were not successful. Eventually, Thompson called the facility, and they confirmed that Father was a client, but this was after the relevant time period.

¶ 30    Finally, Thompson testified that as of May 19, 2025, Father was not close to regaining custody of the children. She explained that this was because he had not completed services.

¶ 31    On cross-examination, Thompson acknowledged that she did not attempt to locate service providers for Father in Ohio. Asked about her observations of Father's visits with the twins, she testified, "Mr. [M.] used the correct redirection with the boys. He engaged and asked the boys about their day and played with the boys appropriately."

¶ 32    On redirect examination, the State asked Thompson about a visit offered to Father when he traveled to Illinois for a court hearing in this case. We note that although Thompson was not asked when this occurred, the docket sheet indicates that Father appeared in person for a hearing on April 14, 2025, and he appeared via Zoom for all other hearings that took place during Thompson's tenure as caseworker. Thompson testified that on the day of the hearing, she asked Father if he wanted to visit with the children. He declined her offer, explaining that he needed to get back to where he was staying overnight. However, he contacted her the following day and asked to see the children. They had a 45-minute visit. The visit did not last longer than 45 minutes because Father indicated that he had to drive back to Ohio.

¶ 33    The State also asked Thompson about the video visit that took place during the pertinent time period. She testified that visit lasted 30 minutes. When asked why it was not longer,

Thompson explained that for children as young as the twins, it was difficult to stay engaged for a full two-hour video visit.

¶ 34　On further cross-examination by Father's counsel, Thompson was asked to clarify Father's reasons for cutting short the in-person visit that took place following a court hearing. She explained that Father wanted to head back to Ohio because he drove alone and had a long drive home.

¶ 35　Father testified on his own behalf. He was first asked how many times he saw the children between February 2024 when they came into care, and May 19, 2025, when the State filed its motion to terminate his rights. Initially, Father said that he thought he had two visits with the children. However, he subsequently stated, "But I think I did—with Austin [Schmohe], I did—I think I did three." Father acknowledged that he cut one of these visits short. He explained that it was a very hot day and the children were "getting all frustrated" as a result. Father believed his visits with the children went well, noting that "they were real co-active" with him. Father stated that in addition to the in-person visits, he had three or four visits via Zoom. He thought those visits also went well.

¶ 36　According to Father, he tried to visit his children in Illinois as often as possible. He stated, however, "It was kind of [a] struggle, the back and forth." Initially, he testified that he drove to Illinois for visits and did not take the bus. He later indicated that he took the bus for one trip, however. He noted that he had to cut that visit short in order to catch the bus back home. Father explained that he had to save money so he could afford to make each trip to Illinois, and sometimes he did not have enough funds to make the trip.

¶ 37　Next, Father testified that he found service providers in Ohio. He stated, "I did what it take [*sic*] to find what I had to get done to move, move forward with this case for my kids." He specifically testified that he participated in a substance abuse evaluation. Asked if this was

9

provided by BrightView, Father replied, "I think they did some of that and did drug randoms and stuff. But Psych and Psych, they did—with the counseling, they did a little of that and more." According to Father, he signed releases of information with both providers and attempted to get them to send information to his first caseworker. He acknowledged, however, that he did not begin individual therapy until after May 19, 2025.

¶ 38    Finally, Father testified that he was currently on disability due to his asthma. He stated that before becoming disabled, he "always worked."

¶ 39    On cross-examination by the State, Father was asked if he provided proof of employment to either of his caseworkers. He indicated that he let them know he had a new job as soon as he "got on." He testified that he provided his caseworkers with copies of his pay stubs even though they never asked him to do so. When asked about the visit with the children that took place after a court hearing, Father stated that he thought it was the caseworker who cut the visit short.

¶ 40    On cross-examination by the guardian *ad litem* (GAL), Father specified that he began receiving disability benefits on July 26, 2025. He repeated his earlier testimony that he always worked before that. However, when asked when he last worked, he replied, "A year or two back."

¶ 41    In ruling from the bench, the court found that the State met its burden of proving Father unfit on all three grounds it alleged. The court recognized the difficulty in arranging services for Father in Ohio. However, the court observed that Father made things more difficult by being indecisive about whether to return to Illinois. The court also highlighted Father's inconsistency in communication with caseworkers, finding that this was "reflective of [his] efforts." The court noted that based on Father's testimony, he was out-of-work for a year before he began receiving disability benefits shortly before the hearing, which did not demonstrate income stability. Finally, the court noted that Father had only three in-person visits with the children and three visits via

Zoom. The court stated, "Visits would have been much more regular if Mr. [M.] would have been a much more consistent presence in this case." The court likewise found that the State met its burden of proving Mother unfit on all three statutory grounds alleged. The court entered a written order finding both parents unfit on all three grounds.

¶ 42     On September 22, 2025, Alexis Krones, the children's Court Appointed Special Advocate (CASA), filed a Permanency Report in advance of the scheduled best-interest hearing. In an introductory section, she noted that the twins were five years old, attended kindergarten, and were "on track" for their age in terms of their development and education. She further noted that the boys played well together and had a strong bond, although they occasionally argued as is typical of siblings.

¶ 43     The CASA report addressed the parents' visitation with the children. Mother had in-person visits scheduled every week, but the report indicated that many of these visits had to be cancelled due to her failure to confirm visits as required. Father was offered supervised visits via FaceTime.[2] In addition, he was permitted to participate in the in-person visits scheduled for Mother any time he was in town. The report noted that many of his Face Time visits did not occur because Father failed to respond to a caseworker or confirm a visit.

¶ 44     Krones's report next addressed the 10 statutory best-interest factors. See 705 ILCS 405/1-3(4.05) (West 2024). Regarding the welfare and physical safety of the children, Krones noted that both children attended all medical appointments. She further noted that Reese received breathing treatments at home due to asthma and wore eyeglasses, which his foster mother was "actively working to replace" after they were scratched.

---

[2]As discussed above, the caseworker testified that she offered Father video visits via Zoom. We presume that Krones's report was referring to the same offer even though she mentioned a different video platform. This discrepancy does not impact our decision.

¶ 45    With regard to the development of the children's identity, Krones stated that the foster mother intended to have the twins baptized in accordance with the family's religious values. As to the children's background and ties, the report noted that in their current foster placement, the twins regularly maintained contact with their extended family members, including overnight visits with their older brother, frequent visits with their maternal grandfather, and occasional visits and regular video calls with an aunt in Chicago.

¶ 46    Addressing the children's sense of attachment, Krones noted in the report that the twins were closely attached to their maternal grandmother (who was their foster mother), their maternal grandfather, and their older brother. She further noted that although both boys remembered their parents, Reese mentioned them only occasionally, and Remi did not mention them at all. After visits, Reese often needed more adult attention, while Remi did not seem to be affected as much.

¶ 47    Regarding the children's wishes and long-term goals, Krones indicated in her report that the twins sought support from their grandmother. Although they occasionally asked questions about their biological parents, particularly Reese, they did not express a desire to be with their parents.

¶ 48    Regarding the children's ties to their community, the report indicated that the children attended elementary school and an after-school program where both had made friends. In addition, the report noted that they often played with the granddaughter of one of their grandmother's friends.

¶ 49    In addressing the uniqueness of every child and family, the report described each child's individual personality and noted that their grandmother had demonstrated an ability to meet each child's needs and recognize their different personality traits.

¶ 50    Regarding the children's need for permanence and the risks inherent in substitute care, the report noted that the children in this case had experienced disruptions while in substitute care due to a change in their caseworker and the inconsistency in visitation with their parents. As a result, Krones believed that securing permanence for the twins was particularly important. She stated that their foster mother had "provided unwavering care and support," thus mitigating the risks of substitute care. Finally, addressing the preferences of people available to care for the children, the report indicated that their grandmother wanted to adopt them.

¶ 51    Krones concluded her report with a recommendation that the court terminate the parental rights of both Father and Mother, thus allowing permanent placement and adoption. She further recommended continued support for their grandmother.

¶ 52    On the same date, a DCFS Best Interest Report prepared by CYFS caseworker Sanya Thompson was filed with the court. The discussion of the statutory best-interest factors in this report was consistent with that in Krones's Permanency Report. The report provided a few additional details, however. Regarding the development of the children's identity, the report noted that although the grandmother's racial identity was not the same as that of the twins, the twins seemed comfortable and well-adjusted in her home. With respect to the children's background and ties, the report noted that the foster mother had expressed a willingness to maintain contact with the twins' biological relatives; however, she wanted Mother to complete rehab and maintain her sobriety before having further contact with the children, and she did not want to have any contact with Father. In addressing both the children's sense of attachment and the uniqueness of every child and family, the report noted that the foster home was the twins' only placement since coming into care and that they had an established relationship with their foster mother prior to entering

13

care because she was their grandmother. Finally, in addressing the preferences of available caregivers, the report noted that the foster mother had a strong support system.

¶ 53    The report briefly addressed both parents' visitation with the children. It indicated that Mother's last visit took place on August 5, 2025, and Father's most recent video call with the children occurred on July 1, 2025. CYFS recommended that the court terminate the rights of both parents and change the goal to adoption.

¶ 54    The matter came for a best-interest hearing on October 28, 2025. At the outset, the trial court noted that Father appeared only through his attorney, despite his having requested a Zoom link. The court further noted that the Zoom program was open in the courtroom and, although it was already seven minutes past the scheduled start time for the hearing, Father had not yet appeared in the "waiting room" for the Zoom meeting.

¶ 55    The court then offered the parties' attorneys an opportunity to make any corrections or additions to the reports filed with the court. Father's attorney stated, "When Mr. [M.] spoke to me today he did indicate that he has now moved to Illinois. He is living with a friend and is working on a permanent address."

¶ 56    After the parties presented arguments, the court announced its ruling from the bench. The court began by noting that the children came into care due to their parents' inability "to provide a stable and safe living environment" and "even just provide the basic needs for the children," such as food, clothing, and shelter. The court explained that both Mother's inability to parent the minors while they were in her care and Father's lack of involvement contributed to the problems. The court observed that there was a clear contrast with the care the minors now received in their foster home with their maternal grandmother, who provided for their basic needs and gave them stability and security.

14

¶ 57    Next, the court addressed the statutory best-interest factors, beginning with the development of the children's identity. The court found that Father did not play much of a role in helping the children develop their identities even before they came into care due to his lack of involvement. Moreover, neither parent had been in a position to help the children develop their identities for the past year and a half.

¶ 58    In considering the children's background and ties, the court noted that their foster mother was a relative. As such, she was able to maintain contact with extended family members.

¶ 59    The court next addressed the children's sense of attachment, noting that the children had a relationship with their grandmother before they came into care. The court stated, "That bond has obviously only deepened because these two young boys have been living with her for this period of time." Based on the reports filed by CASA and DCFS, the court found that the twins viewed their grandmother "as a parental figure."

¶ 60    The court did not find the children's wishes and long-term goals to be a significant factor due to their young age. However, the court noted that their affection and bond with their grandmother was an expression of "how happy and content that they are" with her.

¶ 61    Turning its attention to the children's community ties, the court noted that they had been in their current community for over one and a half years. The court observed that the twins had ties to their school and other activities in the community, something they had been unable to develop prior to coming into care due to their mother's instability.

¶ 62    The court found that consideration of the children's need for permanence "very much [was] in favor of" terminating parental rights. The court explained that the twins' grandmother was willing to adopt them and provide them with the permanence they needed.

¶ 63     Addressing the uniqueness of every child and family, the court noted that the ability of twins to develop their own distinct identities was challenging. The court found, however, that their grandmother was clearly helping them to do that in this case.

¶ 64     With regard to the risks inherent in substitute care, the court noted that "there is always a risk" when parental rights are terminated. However, the court found that in this case, that risk was low because their foster mother was their grandmother; they had been in her care for nearly two years; and she was clearly able to provide the twins with the long-term stability, permanence, and care that they needed.

¶ 65     Lastly, the court addressed the preferences of people available to care for the children. The court found that neither of the parents was "really available to care for the children" due to their respective services. The court explained that Father, who was staying with a friend, did not have an appropriate place for the children to live, while Mother had not progressed with her required services. By contrast, the court noted that the children's grandmother was able to care for them. The court found that this factor weighed in favor of termination. The court concluded that the State established by a preponderance of the evidence that terminating both parents' rights was in the best interest of the twins.

¶ 66     After the court ruled and advised Mother of her appeal rights, Father appeared in the "waiting room" and entered the Zoom meeting for his appearance at the hearing. Addressing Father, the court noted that it was then 2:51 p.m. and the hearing was scheduled to begin at 2:15 p.m. The court then informed Father of its ruling and advised him of his appeal rights.

¶ 67     The court entered a written termination order on the same date, October 28, 2025. Father filed a timely notice of appeal on October 30, 2025. The trial court appointed Hensley to represent Father on appeal. Hensley filed a motion to withdraw on December 29, 2025. On our own motion,

16

we allowed Father until January 26, 2026, to file any *pro se* brief, memorandum, or other documents; however, he did not file a response within the time allotted.

¶ 68                                    II. ANALYSIS

¶ 69    In a memorandum supporting his motion to withdraw, Hensley states that he considered raising the following issues: (1) whether the trial court's findings of unfitness were against the manifest weight of the evidence and (2) whether the court's best-interest determination was against the manifest weight of the evidence. Hensley concluded that both issues would lack merit. For the reasons that follow, we agree.

¶ 70                                    A. Unfitness

¶ 71    Involuntary termination of parental rights involves a two-step process. First, the State must prove that the respondent parent is unfit by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 62. If the trial court finds a parent unfit, the proceedings progress to the second step, during which the State must prove by a preponderance of the evidence that termination of parental rights is in the children's best interests. *Id.* ¶ 73.

¶ 72    We give great deference to the trial court's unfitness findings because that court had the opportunity to observe and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). As such, we will reverse a finding of unfitness only if it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63. A decision is against the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 73    Here, the State asserted three grounds for unfitness, alleging that Father (1) failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (750

17

ILCS 50/1(D)(b) (West 2024)); (2) failed to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period after adjudication of neglect (*id.* § 1(D)(m)(i)); and (3) failed to make reasonable progress towards the return of the children to his custody during any nine-month period after adjudication of neglect (*id.* § 1(D)(m)(ii)). Because a parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence, we will affirm the circuit court's decision if the evidence supports its finding as to any of the grounds alleged. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 63-64.

¶ 74    In considering whether a parent failed to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the children, our "focus is on the parent's reasonable efforts more so than the parent's success." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. Thus, we must take into account any circumstances that made it difficult for the parent to demonstrate the requisite reasonable degree of interest, concern, or responsibility. *Id.*

¶ 75    Significantly, however, a parent cannot avoid a finding of unfitness by showing *some* interest, concern, or responsibility; the question is whether the parent's interest, concern, or responsibility is *reasonable*. *In re M.I.*, 2016 IL 120232, ¶ 30. In addition, because the statutory language is disjunctive, any one of the three elements may provide a basis for a finding of unfitness. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. That is, a parent may be found unfit for failing to maintain a reasonable degree of interest or concern or responsibility. *Id.* Inconsistent visitation and failure to comply with service plan requirements are sufficient to support a finding of unfitness on this ground. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (citing *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24).

¶ 76    Failure to make reasonable efforts to correct the conditions that brought the children into care and failure to make reasonable progress toward their return are two distinct grounds for

18

parental unfitness. *In re Daphnie E.*, 368 Ill. App. 3d at 1066. We assess a parent's reasonable efforts by a subjective standard based on the amount of effort that is reasonable for the particular parent. *Id.* at 1066-67. This requires us to consider "whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34.

¶ 77 By contrast, we measure reasonable progress by an objective standard. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. The benchmark for measuring reasonable progress is "compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d at 1067. A parent has made reasonable progress when the circuit court, "in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 78 In a memorandum supporting his *Anders* motion, Hensley sets forth cogent arguments he considered raising regarding the trial court's findings of unfitness on the grounds of failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare and failure to make reasonable efforts to correct the conditions that led to their removal. These arguments focus on the difficulties Father had in visiting the children and engaging in appropriate services because he was a low-income parent living in another State. Hensley asserts that while the arguments are not necessarily frivolous, they would not likely succeed because the trial court expressly considered the limitations Father's circumstances placed on his ability to comply with services and visit with his children and because this court must give great deference to the trial

19

court's findings in that regard. We are inclined to agree with this assessment. In particular, we believe the trial court's findings are supported by evidence that Father communicated with his caseworkers inconsistently, failed to take advantage of all the opportunities he was offered for video calls with the children, and did not send them any gifts or cards.

¶ 79 Ultimately, however, we need not determine whether the trial court's findings of unfitness on these two grounds were supported by the evidence. We must affirm the trial court's determination if the evidence supports its finding of unfitness as to even one statutory ground. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 64. Reasonable progress is measured by an objective standard and exists when it is possible for the trial court to conclude that it can return custody to the parent in the near future. *In re Daphnie E.*, 368 Ill. App. 3d at 1067; *In re L.L.S.*, 218 Ill. App. 3d at 461. That standard is clearly not met in this case. Father was not involved in the children's lives before they were taken into care, and his visitation was fairly minimal while the case was open, even taking into account the difficulties posed by the distance. As noted previously, he did not take advantage of every opportunity he was offered to have video calls with the twins. In addition, by his own admission, Father did not even begin to engage in individual therapy, as required, until after the State filed a motion to terminate his parental rights more than a year after the case was opened. In view of these circumstances and the deference we must give the trial court's findings, we cannot say its finding of unfitness for failure to make reasonable progress toward the return of the children is against the manifest weight of the evidence. We agree that any argument to the contrary would lack merit.

¶ 80                                B. Best Interest

¶ 81　　Once the trial court finds a parent unfit, the focus shifts to the child. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 73. During the best-interest phase, the parent's interest in maintaining a relationship with the child "must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

¶ 82　　In deciding whether termination of parental rights is in a child's best interest, the trial court must consider the following statutory factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachment; (5) the child's wishes; (6) the child's community ties; (7) the need for permanence and stability and the continuity of the child's relationships with parental figures, siblings, and other family members; (8) the uniqueness of each child and family; (9) the risks inherent in substitute care; and (10) the preferences of the individuals available to provide care. 705 ILCS 405/1-3(4.05) (West 2024). Although the court must consider all applicable statutory factors, it is not required to refer to each individual factor in rendering its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 83　　As with the trial court's unfitness finding, we review its best-interest finding to determine whether it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 74. As stated previously, this occurs "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 84　　Here, the trial court expressly addressed each of the statutory best-interest factors. The evidence overwhelmingly showed that the children were doing well in their foster home. The evidence also clearly established that their grandmother was providing for all their needs, maintaining their connections with extended family members and their community, and offering

21

them the permanence and stability they needed. Considering the record as a whole, we do not believe the trial court's best-interest determination was unreasonable or arbitrary, nor do we believe that the opposite conclusion was clearly evident. See *Id*. Therefore, we conclude that any claim that the court's decision was against the manifest weight of the evidence would lack merit.

¶ 85                                    III. CONCLUSION

¶ 86    For the foregoing reasons, we grant Hensley's motion to withdraw, and we affirm the order of the trial court terminating Father's parental rights.

¶ 87    Motion granted; order affirmed.